******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

McDONALD, J., with whom ECKER, J., joins, dissenting. Connecticut courts have long held that an insurance broker's role as their client's agent ends once the broker successfully procures the client's requested policy. See, e.g., *Cheshire Brass Co.* v. *Wilson*, 86 Conn. 551, 557, 86 A. 26 (1913); see also, e.g., *Lewis* v. *Michigan Millers Mutual Ins. Co.*, 154 Conn. 660, 664, 228 A.2d 803 (1967). See generally 3 S. Plitt et al., Couch on Insurance (3d Ed. Rev. 2011) § 44:36, pp. 44-50 through 44-51. As the Appellate Court observed and discussed, from this general rule, courts have also concluded that, once an agent's agency relationship with an insured ends, the agent's duties to the insured also end, unless special circumstances exist that would impose an ongoing duty on the agent. See *Deer* v. *National General Ins. Co.*, 225 Conn. App. 656, 690–93, 317 A.3d 19 (2024). Here, the majority concludes, based on the application of this general rule that an agency relationship ends once the policy is procured, that an insurance agent has no duty to notify their insured that the insured's policy is at risk of being canceled.

I disagree and write separately for two reasons. First, I would conclude that an insurance agent's duty to "exercise reasonable skill, care, and diligence in effecting the insurance [policy]"; *Ursini* v. *Goldman*, 118 Conn. 554, 559, 173 A. 789 (1934); does not end once the policy is procured. Instead, an insurance agent has an ongoing "duty to notify the [insured] if the insurer declines to continue [to insure] the risk" or threatens to do so. (Internal quotation marks omitted.) *Precision Mechanical Services, Inc.* v. *T.J. Pfund Associates, Inc.*, 109 Conn. App. 560, 566, 952 A.2d 818, cert. denied, 289 Conn. 940, 959 A.2d 1007 (2008); see also id. ("[a]n agent or broker cannot sit idly with a cancellation notice or information, but must seasonably inform the insured client thereby giving the client sufficient time to obtain protect[ion] with another insurer" (internal quotation

marks omitted)). Second, I believe that it is long past time that this court reexamine our case law that applies an antiquated understanding of the agency relationship that exists between an insurance agent and an insured, which has not kept pace with the evolution of the insurance industry. Accordingly, I respectfully dissent.

The record, viewed in a light most favorable to the plaintiffs, Lee Deer and Keleen Deer, reveals the following facts and procedural history. At the request of the Deers, the defendant The Trahan Agency, Inc. (Trahan), a captive Allstate Insurance Company agent,[1] procured a homeowners insurance policy underwritten by Century-National Insurance Company. The Deers' policy began on June 27, 2019, and would last through June 27, 2020. They had long been customers of Allstate, having first purchased a homeowners insurance policy from Allstate through Trahan's predecessor agent in 2001. The Deers renewed their Allstate homeowners insurance policy fifteen times, ending their relationship with Allstate when they purchased a homeowners insurance policy through another agent and insurer that provided coverage from March, 2017, through June, 2019. Although Trahan was a captive Allstate agent, Allstate had stopped underwriting homeowners insurance policies in Connecticut. Allstate, however, created an expanded insurance program, which allowed captive Allstate agents to sell homeowners insurance policies underwritten by other insurers that Allstate had selected. Because Trahan signed onto Allstate's expanded insurance program, it was authorized to sell homeowners insurance policies underwritten by Century-National to Connecticut residents.

Shortly after Trahan procured the Deers' homeowners insurance policy, which was underwritten by Cen-

---

[1] A "captive" insurance agent is an agent that is authorized to sell insurance policies from only one insurance company. See *Deer* v. *National General Ins. Co.*, supra, 225 Conn. App. 699.

tury-National, Jessica Perry, Trahan's office manager, informed Lee Deer that a house inspection may be required. Century-National hired a third party to conduct an inspection of the house, but the Deers did not know that it had ever taken place. Vanessia Babbitt, a Century-National representative, emailed the inspection results only to Perry. Babbitt explained that the Deers' house was "[m]issing siding on [the] exterior walls" and "is in need of repair . . . ." Babbitt further instructed Perry to "discuss the situation with your insured, as repairs are required as a condition of continued coverage." Finally, she requested that Perry inform the Deers that "[p]roof of repair is required . . . [n]o later than [March 27, 2020]," which was three months prior to the time that the Deers' annual policy was automatically set to renew.

Perry did not provide the inspection results to the Deers or inform them that they needed to send proof of repairs to Century-National to ensure continued insurance coverage. Consequently, the Deers did not respond to Century-National by March 27, 2020, with proof of repairs. Babbitt again emailed Perry to explain that, because Century-National had "not receiv[ed] a response [by March 27, 2020], the policy ha[d] been set to nonrenew." The email also implied that Perry should inform the Deers that their policy, which had now been set to nonrenew, could be renewed if the Deers "submit-[ted] proof of repairs . . . by the policy expiration date." Perry again failed to notify the Deers that they needed to send proof of repairs to Century-National as a condition of continued coverage.

Unsurprisingly, the Deers never sent proof of repairs to Century-National. Trahan claims that it notified the Deers of the inspection results and impending nonrenewal. The Deers claim that Trahan never notified them of the inspection results, that repairs were required as a condition for continuing coverage, or that their policy

would not automatically renew if they failed to timely send proof of the repairs. Because Trahan failed to notify the Deers of the potential nonrenewal of their insurance policy, the Deers, apparently, instead operated on the assumption that their policy was set to automatically renew on June 27, 2020, just as their prior Allstate homeowners insurance policies had renewed fifteen times upon payment of the premium.[2] To make matters worse, because of an oddity with the Deers' mailbox location, the Deers also did not receive actual notice from Century-National that their homeowners insurance policy was not automatically renewing on June 27, 2020. See General Statutes § 38a-323 (a) (1) (requiring insurers to notify insureds of intent to terminate insurance policy at least sixty days prior to policy nonrenewal). To summarize, we must accept, at the summary judgment stage, that the Deers themselves had no reason, at any time, to believe that their homeowners policy was at risk of either cancellation or nonrenewal.

Shortly after the Deers' policy expired, an accidental fire destroyed their house. While the house was still hot with embers, Lee Deer called Allstate to begin the claims process. Lee Deer believed that he had an active homeowners insurance policy with Allstate because he had purchased his homeowners insurance policy through Trahan, a captive Allstate agent. When he discovered that Allstate had not underwritten a policy for him, he attempted to contact Perry by phone during the next few hours. After learning about Lee Deer's attempts to reach her, but before responding to him, Perry called Century-National to ask about the status of the Deers'

---

[2] There is nothing in the record that reflects whether the Deers paid the premium for the renewal that did not occur. However, the second email that Century-National sent to Trahan indicated that Century-National set the Deers' policy to nonrenew after they did not respond to the inspection results, which is contrary to the prior automatic policy renewals that had occurred in the Deers' fifteen prior policies.

policy. Century-National informed Perry that the Deers' did not have an active homeowners insurance policy because their prior policy was not renewed. Perry then called Lee Deer to tell him that he no longer had homeowners insurance coverage. The next week, Perry responded to Babbitt's prior emails about the inspection results by forwarding a copy of Century-National's nonrenewal notice that Trahan received but that the Deers claim they never received. One Century-National employee interpreted Perry's email as Trahan's attempt to "[cover] themselves . . . ."

The Deers argue that Trahan had a duty to notify them of the inspection results, the conditions for continuing coverage, and the subsequent nonrenewal that resulted from the Deers' failure to comply with the conditions for continuing coverage. They argue that the general rule that an insurance agent's duties to an insured end once a policy is procured should not be understood to categorically preclude an agent's liability in all circumstances. I agree and conclude that, under these circumstances, Trahan had a duty to notify the Deers of the potential cancellation or nonrenewal of their policy. Because this case highlights the antiquated manner in which our case law addresses the relationship between an insurance agent and an insured, I also believe that this court's rote application of centuries old case law must be reexamined.

## I

I begin with the question of whether Trahan owed a duty to the Deers under our existing law. An insurance agent "owes a duty to his principal to exercise reasonable skill, care, and diligence in effecting the insurance [policy], and any negligence or other breach of duty on his part [that] defeats the insurance [policy that] he undertakes to secure will render him liable to his principal for the resulting loss." *Ursini* v. *Goldman*, supra,

118 Conn. 559. This court, like many others, has long held that, once an agent procures an insurance policy for their client, the "general rule" is that the agent "ceases to be the agent of the insured . . . ." *Cheshire Brass Co.* v. *Wilson*, supra, 86 Conn. 557, citing *Hermann* v. *Niagara Fire Ins. Co.*, 100 N.Y. 411, 415, 3 N.E. 341 (1885); see also, e.g., *Lewis* v. *Michigan Millers Mutual Ins. Co.*, supra, 154 Conn. 664. Courts have also concluded that, as a general matter, once the agency relationship ends—which traditionally has been taken to mean once the agent procures the requested insurance policy—an insurance agent's duties to the insured end, unless special circumstances apply. See, e.g., *Precision Mechanical Services, Inc.* v. *T.J. Pfund Associates, Inc.*, supra, 109 Conn. App. 565; see also, e.g., *Certain Interested Underwriters at Lloyd's, London* v. *Bear, LLC*, 260 F. Supp. 3d 1271, 1282 (S.D. Cal. 2017), aff'd, 796 Fed. Appx. 372 (9th Cir. 2019); cf. *AGA Fishing Group Ltd.* v. *Brown & Brown, Inc.*, 533 F.3d 20, 23 (1st Cir. 2008) (discussing effect special circumstances may have on insurance agent's duty to insured); *Farm Credit Midsouth, PCA* v. *Bollinger*, 548 S.W.3d 164, 176 (Ark. App. 2018) (same). See generally 3 S. Plitt et al., supra, § 46:38, pp. 46-84 through 46-93.

As a preliminary matter, I disagree with the majority that this general rule, which cuts off an insurance agent's liability to their insured once they procure the initial policy, applies under these circumstances. A survey of cases across jurisdictions indicates that this rule clarifies that, as the insured's agent, an insurance agent has no ongoing duty to advise an insured regarding future policy needs, to inform the insured of the need for coverage in addition to that which the insured had requested and that the agent had already procured, or to act on the insured's behalf to procure such policies. See, e.g., *Lewis* v. *Michigan Millers Mutual Ins. Co.*, supra, 154 Conn. 664; *Precision Mechanical Services,*

*Inc.* v. *T.J. Pfund Associates, Inc.*, supra, 109 Conn. App. 565; *Baldwin Crane & Equipment Corp.* v. *Riley & Rielly Ins. Agency, Inc.*, 44 Mass. App. 29, 31–32, 687 N.E.2d 1267 (1997), review denied, 427 Mass. 1101, 692 N.E.2d 963 (1998); *Lincoln Life & Annuity Co. of New York* v. *Wittmeyer*, 211 App. Div. 3d 1564, 1569, 182 N.Y.S.3d 421 (2022). Stated otherwise, the rule limits a broker's duties to the policy or policies that the insured expressly or impliedly authorized the broker to procure as the insured's agent. See, e.g., *Lewis* v. *Michigan Millers Mutual Ins. Co.*, supra, 664. Under the general rule, then, an agent's duties do not extend to additional, amended or future policies.

This case does not fit within the scope of this general rule. The Deers do not claim that Trahan had a duty to *procure* another insurance policy or to *advise* them about additional coverage needs; rather, they contend that Trahan had a duty to notify them of material information about the existing policy procured by Trahan on behalf of the Deers that jeopardized the continuation of coverage for which Trahan had received its full commission. They claim that Trahan had a duty to notify them that, because of the inspection results, the Deers needed to repair their siding, and that, if they failed to do so in a timely manner, their insurance coverage would be terminated.[3] But the general rule that a broker's duties end once the policy is procured does not apply when determining whether a broker had a duty in a situation in which the broker learned of information that would defeat the purpose of an insured's existing policy. See, e.g., *Ursini* v. *Goldman*, supra, 118 Conn. 559. Accordingly, I do not think that the general rule should guide this court's inquiry under these particular circumstances.

---

[3] The Deers argue that Trahan had a duty to "ensur[e] that coverage [did] not lapse, cancel, or nonrenew. This duty include[d] timely and properly communicating with [the Deers] to advise [them] of known problems with, or lapses in, continued insurance coverage."

The majority largely frames the issue as a dispute about whether Trahan owed a duty to notify the Deers about the need to renew their policy. Although the Deers do claim that the duties owed to them by Trahan extended to renewing the policy, they also argue that Trahan's duties included a duty to inform them of issues related to the then existing policy. On the facts of this case, in other words, the question of whether Trahan owed a duty to the Deers with respect to the renewal of their policy (i.e., to procure a new policy) is inextricably intertwined with the question of whether Trahan owed them an ongoing duty with respect to the policy it had already procured for them, and that was in effect, when Century-National had sent its first email about the inspection results. In my opinion, the majority relies on an artificial, bright-line distinction between cancellation and nonrenewal that cannot be maintained under the circumstances of this case. The majority's analysis largely avoids the duty inquiry with respect to the ongoing viability of the policy that was procured by Trahan within the scope of its agency, and for which it was compensated.

Regarding an agent's duty with respect to an insured's existing policies, an insurance agent "owes a duty to his [insured] to exercise reasonable skill, care, and diligence in effecting the insurance [policy], and any negligence or other breach of duty on his part [that] defeats the insurance [policy that] he undertakes to secure will render him liable to his [insured] for the resulting loss." Id. An agent's duties regarding a policy that the agent has already procured do not categorically end once the policy has been procured. The Appellate Court has recognized that insurance agents have "[an] obligation to seek continuation of an [existing] insurance policy," which includes "the duty to notify the applicant if the insurer declines to continue [to insure] the risk, so the applicant may not be lulled into a feeling of security

or put to prejudicial delay in seeking protections else-where." (Internal quotation marks omitted.) *Precision Mechanical Services, Inc.* v. *T.J. Pfund Associates, Inc.*, supra, 109 Conn. App. 566; see, e.g., id. ("[a]n agent or broker cannot sit idly with a cancellation notice or information, but must seasonably inform the insured client thereby giving the client sufficient time to obtain protect[ion] with another insurer" (internal quotation marks omitted));[4] see also, e.g., 12 E. Holmes, Appleman on Insurance (2d Ed. 1999) § 86.6, p. 497.

The dispute here necessarily implicates Trahan's duties regarding the continuation of an existing policy. Century-National's first email instructed Trahan to notify the Deers that, "as a condition of continued coverage," the Deers were required to repair the siding on their house. At that time, Century-National's communications strongly suggested that it would cancel the Deers' initial policy prior to the policy's end date.[5] The second email stated that, because the Deers had not responded to the prior email, their policy was set to nonrenew, but that it could be renewed if the Deers timely submitted proof that they have fixed the siding

---

[4] The majority's claim that this sentence from *Precision Mechanical Services, Inc.*, is taken out of context results from a mechanical interpretation of the Appellate Court's reasoning. It is true that the court in *Precision Mechanical Services, Inc.* v. *T.J. Pfund Associates, Inc.*, supra, 109 Conn. App. 566, was considering whether the "broker . . . agreed to seek renewal of a policy," as the majority points out. (Emphasis omitted; internal quotation marks omitted.) Footnote 7 of the majority opinion. But the court did not conclude that no other grounds existed for determining that an insurance agent had an "obligation to seek continuation of an insurance policy," which would include "the duty to notify the applicant if the insurer declines to continue [to insure] the risk . . . ." (Internal quotation marks omitted.) *Precision Mechanical Services, Inc.* v. *T.J. Pfund Associates, Inc.*, supra, 566. The same duty can arise for other reasons, as I have contended in this dissent.

[5] Babbitt, Century-National's representative, wrote: "Please discuss the situation with your insured, as repairs are required *as a condition of continued coverage*." (Emphasis added.)

issue.[6] Because Trahan knew that Century-National had threatened to cancel coverage on an existing policy and, later, to not automatically renew the policy because of the siding issue, Trahan's duties to the Deers with respect to that policy had not yet ended. Instead, Trahan continued to owe a duty "to exercise reasonable skill, care, and diligence"; *Ursini* v. *Goldman*, supra, 118 Conn. 559; which includes "the duty to notify the [insured] if the insurer declines to continue [to insure] the risk . . . ." (Internal quotation marks omitted.) *Precision Mechanical Services, Inc.* v. *T.J. Pfund Associates, Inc.*, supra, 109 Conn. App. 566. I would conclude that Trahan had a duty to notify the Deers about the condition for continuing coverage and the threat of nonrenewal if they did not send Century-National proof of compliance. Accordingly, I would reverse the Appellate Court's judgment upholding the trial court's granting of summary judgment as to Trahan and remand the case for further proceedings because there is a genuine issue of material fact regarding whether Trahan notified the Deers about the inspection results and nonrenewal. See, e.g., *Shoreline Shellfish, LLC* v. *Branford*, 336 Conn. 403, 407, 420, 246 A.3d 470 (2020).

II

In the words of Massachusetts Supreme Judicial Court Justice Oliver Wendell Holmes, later a justice of the United States Supreme Court, "[i]t is revolting to have no better reason for a rule of law than that so it was laid down [centuries ago] . . . [and] [i]t is still more revolting if the grounds [on] which it was laid down have vanished long since . . . ." O. Holmes, "The Path of the Law," Address at Boston University School of Law (January 8, 1897), in 10 Harv. L. Rev. 457, 469

---

[6] Century-National's internal notes confirm that, even if the Deers had paid their premium to renew their policy, the policy would still not renew if the Deers did not send Century-National proof of compliance with the email about the required repairs.

(1897). Regardless of whether the rule relied on by the majority applies in this case, this court must reexamine our centuries old case law, which has not adapted to changes in the insurance industry and is no longer reflective of modern agent and insured relationships. The majority seems to implicitly reason that the purpose of the general rule involves limiting an insurance agent's liability. Yet, the majority does not cite, and I could not find, any case that articulates the public policy decisions that inform the general rule. The "rule" is the rule because it has always been the rule. The majority certainly does not enlighten us on how or why the "rule" is logical or meritorious in the present. Neither does it provide an explanation of why applying the rule here advances any policy interest.[7] In other words, the majority's adherence to our admittedly long-standing precedent fails to consider the range of policy concerns that we might otherwise examine, including the significant changes in the insurance industry since this rule was first adopted more than 100 years ago. See, e.g., *Raspberry Junction Holding, LLC* v. *Southeastern Connecticut Water Authority*, 340 Conn. 200, 206, 263 A.3d 796 (2021). Just because a legal principle has been long established does not mean that it was rightly decided or that it remains relevant to an evolving industry.

One of the "great virtue[s]" of the common law is "its adaptability to the conditions and needs of changing times." *Smith* v. *Brennan*, 31 N.J. 353, 362, 157 A.2d 497 (1960). Little has changed with the common-law rule of insurance agent liability. Yet, the insurance industry, and an insurance agent's role in it, has signifi-

---

[7] To the extent that the majority reasons that the purpose of the rule is to assign responsibility for notifying an insured of a policy cancellation or nonrenewal to the insurer, I disagree. That may well be the purpose of § 38a-323 (a) (1), which requires insurers to provide notice of nonrenewal to insureds at least sixty days prior to a policy's nonrenewal. But the common-law rule that an insurance agent's duties to an insured end once a policy is procured is focused on the scope of an agent's duties to an insured.

cantly evolved over the last century. See, e.g., *Sobotor v. Prudential Property & Casualty Ins. Co.*, 200 N.J. Super. 333, 341, 491 A.2d 737 (App. Div. 1984) (emphasizing "the increasing complexity of the insurance industry"). Ordinarily, this court would consider "the normal expectations of the participants in the activity under review" when determining whether a person or entity has a duty in a particular situation. (Internal quotation marks omitted.) *Raspberry Junction Holding, LLC* v. *Southeastern Connecticut Water Authority*, supra, 340 Conn. 206; see also, e.g., *Cheshire Brass Co.* v. *Wilson*, supra, 86 Conn. 557 (noting that broker may have duty to insured after procurement of insurance policy if "course of business between the parties . . . warrant[s] the inference" that ongoing duty exists). In this case, interpreting the record in a light most favorable to the Deers, it appears that the parties expected that Trahan would notify the Deers of the inspection results and nonrenewal. Trahan claims that its employees called multiple times to notify the Deers of this information. Perry's email response to Century-National, following the fire at the Deers' residence, indicates that she believed that Trahan erred in not forwarding that information and, therefore, that Trahan would be expected to notify the Deers. The Deers' expert witness also testified that a reasonable insurance agent would notify an insured when an insurer has threatened to cancel or nonrenew an existing insurance policy, especially if the agent receives an email from the insurer with inspection results tied to that policy. The employees at Century-National also appeared to believe that Trahan should have provided that information to the Deers. And it is without question that the Deers reasonably expected that Trahan would pass along that information.

Although the parties' expectations are only one policy factor that this court considers in determining whether

a duty exists in a particular circumstance; see, e.g., *Raspberry Junction Holding, LLC* v. *Southeastern Connecticut Water Authority*, supra, 340 Conn. 206–207; those expectations are critical because they underscore the gap between ordinary business practices and the law. In this case, the majority's rote application of the general rule also highlights that, in this instance, the common law has not adapted to changing conditions. Not only has the common law not evolved to account for changes in the insurance industry, but it is also inconsistent with the legislature's treatment of insurance agents as professionals. After all, Connecticut heavily regulates and licenses insurance agents. See General Statutes § 38a-702a et seq. And the majority's application of the rule does not reflect the fact that national associations of insurance agents consider their agents as professionals and strive for others to view them as professionals. See, e.g., National Federation of Insurance Agents, Elevating the Insurance Profession, available at https://nationalfia.org/elevating-the-insurance-profession/ (last visited September 2, 2025). Instead, the majority reproduces the view that insurance agents are mere salespersons, passive conduits between insurers and insureds, rather than crucial actors within the insurance system, on whom Connecticut residents depend on to provide professional services. See, e.g., D. Sakall, Note, "Can the Public Really Count on Insurance Agents To Advise Them? A Critique of the 'Special Circumstances' Test," 42 Ariz. L. Rev. 991, 1011–12 (2000) (suggesting that Connecticut is one of few states that has case law allowing for possibility that insurance agents can be viewed as professionals rather than mere salespersons). Insurance agents are professionals in their field. The law should reflect that by allowing for the possibility that an insurance agent has a duty to act as a reasonable insurance agent would and to inform insureds of a notice of a policy cancellation or non-renewal.

Finally, I note that the rule that the duties an insurance agent owes to an insured end once the policy is procured derives from the law of agency. See, e.g., *Cheshire Brass Co.* v. *Wilson*, supra, 86 Conn. 557 (explaining "general rule" that insurance broker's role as their client's agent ends once broker successfully procures client's requested policy). Traditionally, the law of agency has taken a more bright-line approach in determining when an agency relationship ends. See, e.g., 1 Restatement, Agency § 106, p. 273 (1933). But modern agency law increasingly involves a circumstantial, fact-driven analysis in determining when an agency relationship terminates and the scope of that relationship. See, e.g., 2 Restatement (Third), Agency, § 8.11, p. 369 (2006). Consistent with this circumstantial approach, § 8.11 of the Restatement (Third) of Agency also suggests that, in some circumstances, the duties an agent owes a principal, including an agent's duty to provide information to their principal, might survive after the formal agency relationship ends. See, e.g., id., § 8.11, comment (c), p. 376; id., § 8.11, reporter's note to comment (c), p. 384, citing *In re Cooper Mfg. Corp.*, 131 F. Supp. 2d 1230, 1237 (N.D. Okla. 2001); see also, e.g., 2 Restatement (Third), supra, § 8.11, p. 369 ("[a]n agent has a duty to use reasonable effort to provide the principal with facts that the agent knows . . . when . . . subject to any manifestation by the principal, the agent knows or has reason to know that the principal would wish to have the facts or the facts are material to the agent's duties to the principal"). Thus, the standard regarding an insurance agent's liability to their insured, as it exists today, is premised on outdated agency principles. This causes me greater concern for this court's continued adherence to a rule that is no longer justified in practice or by underlying legal principles.

For the foregoing reasons, I respectfully dissent.